**Justin GOMES, Plaintiff, Appellee,**

v.

**Michael V. FAIR, et al., Defendants, Appellants.**

**No. 83–1296.**

United States Court of Appeals, First Circuit.

Argued Oct. 6, 1983.

Decided June 27, 1984.

518

James Remeika, Counsel, Dept. of Correction, Cambridge, Mass., with whom John W. Bishop, Jr., Sp. Asst. Atty. Gen., Boston, Mass., was on brief, for defendants, appellants.

Martin C. Gideonse, Cambridge, Mass., for plaintiff, appellee.

Before CAMPBELL, Chief Judge, GIBSON,* Senior Circuit Judge, and COFFIN, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal by eight Massachusetts prison officials from an order of the district court permanently enjoining them from conducting a prison disciplinary hearing, and from taking other measures, following an incident in which a male inmate, Justin Gomes, handed a number of handwritten poems, some of them sexually explicit, to Patricia Deschenes, a female member of the prison staff. Gomes brought this action under 42 U.S.C. § 1983, claiming violation of first, fifth and fourteenth amendment rights. We reverse.

## I.

When Justin Gomes entered the Massachusetts prison system in October 1981, he was sent immediately to the Massachusetts Correctional Institute ("MCI") at Concord for screening to determine his appropriate "classification" or placement within the system. During his stay at Concord he was counseled on a weekly basis by Patricia Deschenes, who a month earlier had begun an unpaid internship with the Department of Legal Medicine for her Masters degree in counseling.[1] In February 1982 Gomes was classified to MCI-Walpole, a maximum security institution, thus terminating the counseling. Ms. Deschenes testified that "[t]owards the end, there seemed to be a strong attachment that we

---

* Of the Eighth Circuit, sitting by designation.

1. Later, in September 1982, Ms. Deschenes was hired by the Massachusetts Department of Correction as a psychometrist, a position she held when the incident in question occurred. When the case was tried in April 1983, she testified that she had a B.S. in General Education and an M.S. in Criminal Justice Counseling from Northeastern University.

had to work on severing before his transfer." While at Walpole Gomes received two short notes from Deschenes, approved by her supervisor, encouraging him to seek further counseling. Thereafter Gomes was transferred to MCI-Norfolk; and then, in September 1982, he was sent to the Plymouth Forestry Camp, a minimum security institution. Because four disciplinary reports [2] were lodged against Gomes while he was at the Forestry Camp, he was sent back to MCI-Concord in December 1982 for further screening and for reclassification. Shortly after his return to MCI-Concord, Gomes saw Deschenes and sought her out.

The initial meeting between Gomes and Deschenes was, according to both accounts, uneventful. Deschenes testified that she explained to Gomes that she no longer had counseling responsibilities and that, although occupying an office (sometimes also referred to as a "classroom") at the prison school, she was not teaching but was conducting diagnostic tests. While Gomes identified Deschenes as a "teacher" in his testimony, his pretrial affidavit submitted into evidence by defendants correctly identified her as a "psychometrist," her actual role. Both agreed that at one of their initial encounters Deschenes introduced Gomes to Linda Craven, a teacher at the prison school. Gomes followed up by enrolling in a refresher course in English with Craven.

While the record reflects agreement as to the above facts, Gomes and the prison officials' testimony differ as to the subsequent events. Gomes testified that he and Deschenes spoke in her office for an hour on the day they first met, a fact denied by Deschenes, and that he returned to her office, which was next to Craven's classroom, "[f]ive or six times" thereafter for up to "[f]ive, ten, fifteen minutes ... [s]ometimes longer" to talk about "[w]hatever happened to be on my mind that day." Gomes testified that Deschenes had invited him to visit in this manner, but Deschenes testified that after their first meeting she only engaged in "courtesy talk" in the hallway [3] until, a couple of weeks later, they met for 20 minutes in her classroom at Gomes's request.

Deschenes testified that at the later meeting Gomes asked to reestablish their counseling relationship and she told him that was not possible since, as she had previously explained, her role at the prison did not include counseling. She did, however, offer to refer him for counseling by staff at the Department of Legal Medicine. Gomes accepted this suggestion reluctantly, but (according to Deschenes) said he didn't think he could talk to anyone the way he talked to her. He then suggested, she testified, that they "get together to talk" outside the institution after his parole in August 1983. Deschenes said she considered Gomes's suggestion out of order and firmly rejected this request. Since she thought Gomes now understood her position, the meeting ended on a friendly note. Nonetheless, Deschenes testified that she immediately went to Craven's nearby classroom and asked for help monitoring Gomes, "[b]ecause," she explained, she and Craven were both "cautious about security, being women in a male institution." Craven, also a witness, confirmed that Deschenes had told her about Gomes's request to get together after August, and that she "was very concerned about Deschenes being right next door" to her class, which Gomes was attending. Deschenes testified that after this conversation she limited any conversation with Gomes in the hallways "and tried to become a little more distant."

Deschenes testified that on several occasions, when she and Gomes passed in the hall, she was disturbed by remarks made in her presence by him to other prisoners about her and by non-verbal signs of com-

---

2. The disciplinary reports were for "use of controlled substances," failure to comply with "program recommendations" and "difficulties with his work assignments."

3. The district court apparently rejected Gomes's testimony of frequent meetings in Deschenes's office: it found the "sum total of the contacts between the two before the poetry incident consisted of two short conversations in Deschenes' classroom and chance encounters in hallways."

munication from him to her. On one such occasion, when Gomes remarked on "how lovely" she appeared, she took him aside and warned that such familiarity was inappropriate and could lead to a disciplinary charge, a warning then reiterated to Gomes by Gomes's companion. Deschenes testified that it was prison policy that female employees "are not to allow those kinds of comments from the men that we work with."

There is no dispute that in late January or early February 1983 Gomes delivered on his own initiative a file containing written materials to Deschenes. According to Deschenes, Gomes asked her simply to "look over" the contents on that occasion, but retrieved the file the same afternoon before she read it.[4] On February 3, she testified, Gomes returned with the folder, standing silently outside Deschenes's office with a "sad" expression on his face. When Deschenes asked him what he wanted, he asked her if she now had time to "read" or "look at" the contents. She took the file and Gomes returned to his cell. Deschenes testified he did not tell her it contained poetry.

Shortly thereafter, Deschenes opened the file and read the poem, "Sexually but interlecually," which was on top of the pile and scanned the remainder. A copy of the poem is appended. She immediately took the file to Daniel Farnkopf, the school principal, and to school officer Maurice, to ask their advice. Thereafter she consulted with other correctional authorities and several days later prepared and signed a disciplinary report, *infra*. She did so, she testified, because

> I interpreted them as being poems written for me. Love poems and poems that were very sexually explicit. And I thought it was very inappropriate, given the context of the setting we were in.
>
> *  *  *  *  *  *
>
> It's hard to describe it. I can't say that I was fearful, but I was very uncom-

fortable with receiving something like that from an inmate....

Deschenes went on to testify that in view of their prior counseling relationship, and some of the things they had talked about, "something like that from him was very disturbing to me. And I took it very personally. I thought they were meant for me and written for me and written with me in mind."

Gomes gave a substantially different version of the poetry incidents. He testified that he had begun writing poetry in 1978, that he showed the poems to Forestry Camp inmates in 1982, and that the poems submitted to Deschenes represented his entire writings during the last few years. Gomes testified,

> I basically wrote the poems to a certain young lady who means a lot to me, a Miss Toni Johnston. The majority of them poems are for her. I have sent copies to her. I have given copies to other inmates, who have read them and liked them.... [A] few of them were written for myself.

Gomes said that when he submitted the poems to Deschenes, he expressly asked her to "proofread" them and warned her that they were in "rough draft" and included "street language." He wanted help with "grammar and spelling." On at least the first occasion, he told her the materials were "poems." Gomes testified that he asked Deschenes for assistance because he considered her his "friend." He gave the warning, he said, "[b]ecause of the things that I had written there. I have a lot of respect for the lady. And I didn't want her to be shocked." He denied knowing that "Sexually but interlecually" was on top.

News of the incident reached George Vose, Superintendent of MCI-Concord, during his evening briefing session on the same day. By that time, Gomes had already been removed to the segregation unit on order of Deputy Superintendent James

---

4. Craven testified that when she asked Gomes about the contents of the file, he told her, "They're personal."

Bender. Vose testified that he affirmed the decision to segregate Gomes pending an investigation. He explained,

I had a staff member at the institution that felt threatened by an action of an inmate. For the safety of that staff member, I felt that it was important that he be separated from the population, separated from freedom of movement within the population. I was concerned because of the nature of that information. There was an indication of possible sexual misconduct. That is a very serious matter in a prison environment.

Gomes was notified of the investigation by letter the following day, February 4.

During the next several days Gomes, Deschenes and others were interviewed by Bender who reported to Vose on a regular basis. Vose testified that on February 5, Bender made the following report after speaking with Deschenes: that during Gomes's first stay at Concord, when he was counseled by Deschenes, Gomes had attempted to establish "a more personal relationship with her," which she had discouraged; that after his return, however, it remained apparent that he continued to have "some sort of emotional attachment" to her; that he "had been hanging around [her] classroom" and had "indicated to her ... that he was interested in a personal relationship," which she again discouraged and which led her to enlist the support of other staff "to watch out for him if he came to her classroom"; and that it was "in light of that entire situation" that she interpreted the delivery of the "written materials" with its "[s]exually explicit language" to constitute "a sexual advance towards her by him." After receiving this report, Vose testified, he "felt more comfortable with the situation," concluding

that it "warranted additional investigation and possibly even a disciplinary report, which did result."

Deschenes wrote, executed and filed a so-called major disciplinary report [5] on February 8, five days after the incident. She testified the report was filed late because of some confusion over whether she or another should submit it and because of an intervening weekend and snowstorm during which she was absent from work. Charging Gomes with three offenses listed in the Department of Corrections Code of Offenses, 103 C.M.R. § 430.22, the report stated the following under the heading "Description of Offense":

On Thursday February 3, 1983 at 3:00 p.m. in my classroom in H-Building inmate Justin Gomes handed me the attached folder and asked me to read its contents. After quickly scanning the several handwritten papers inside the folder, I showed it to Officer Maurice and the school principal, Daniel Farnkopf. These materials contained sexually explicit passages.

# 1 Disobeying an order of, lying to, or insolence towards a staff member.

# 2 Violating any departmental rule or regulation, or any other rule, regulation or condition of an institution or community-based program.

# 19 Use of obscene, abusive or threatening language, action or gesture to any inmate or staff member.

In response to this report Vose scheduled a disciplinary hearing for February 23, 1983, at MCI-Concord. On February 10 Vose revised Gomes's classification order— set on January 25 for MCI-Norfolk—to

---

5. A disciplinary report initiates a formal administrative proceeding governed by state regulations, *see* 103 C.M.R. § 430, which provide, inter alia, for service of "the disciplinary report, a notice of hearing, and a request for representation and/or witness form," section 430.11(1); representation by an attorney or law student, section 430.12(1); recording of disciplinary hearings, section 430.12(3); an impartial hearing panel, section 430.13(2); restriction of evidence to that "on which reasonable persons are accustomed to rely in the conduct of serious affairs," section 430.13(3); the right to confront the reporting officer, section 430.14(4), and to call witnesses, section 430.12(1), 430.14(6); the rendering of written decisions including a description of the evidence, statements of reasons, and notice of right to appeal, section 430.17(1); and appellate procedures, section 430.18.

MCI-Walpole[6] with the additional "[c]ondition" that "if found guilty" on the disciplinary charge he be evaluated as a sexually dangerous person under Mass.Gen.Laws ch. 123A, § 6. Vose testified that he revised his decision based upon the additional information he had received about Gomes relative to the February 3 incident which, in effect, cast new light on Gomes's earlier deteriorating custody record, involving the four disciplinary reports, at the Plymouth Forestry Camp. The poetry incident which formed the basis of the disciplinary charge, factored into his decision, he testified, as did "the other information I had received from Mr. Bender," namely, Gomes's "attachment" to Deschenes and his attempts to establish a "personal relationship." Vose testified that an innocent finding on the disciplinary charge would cause a reassessment of the reclassification but did not say that it necessarily would cause restoration of Gomes's classification to MCI-Norfolk.

Gomes's transfer to MCI-Walpole was carried out on February 17. According to Vose, it occurred prior to the disciplinary hearing because he needed the space in the MCI-Concord segregation unit for other prisoners. Upon the transfer Gomes's disciplinary hearing was rescheduled to March 4 at MCI-Walpole.

## II.

Gomes filed this action on February 18, the day after his transfer to MCI-Walpole, charging that his prehearing segregation and transfer had occurred solely because he had exercised a first amendment right to write poetry and to give it to a prison

staff member for proofreading assistance. Gomes requested in his complaint both declaratory and injunctive relief as well as compensatory and punitive damages.

The district court granted a temporary restraining order ("TRO") on February 24, barring any further action including the holding of a disciplinary hearing until the court could itself conduct a hearing on the issue of permanent injunctive relief.[7] Starting April 6—a month after the disciplinary board was to have heard Gomes's case—the court held a two-day hearing, devoted exclusively to the issue of preliminary and permanent injunctive relief. Gomes and a student attorney[8] testified for plaintiff. Vose, Deschenes, Craven, and Richard Hanson, a correctional officer, testified for defendants. The court also considered the poems themselves, affidavits given earlier by the witnesses, correctional records, and other documents.

In an opinion dated April 18 the district court framed the dispute as how to interpret the February 3 incident: Was it a giving of poetry to Deschenes for proofreading followed by unwarranted disciplinary action based on the "content of the poetry"? Or was it a matter of "sexual harassment, . . . an improper overture towards a female staff member warranting discipline and segregation in the interest of prison security"? The court concluded that plaintiff sought only "grammatical assistance and that he did not proposition Ms. Deschenes." In describing the relationship between Deschenes and Gomes prior to the poetry incident, the court made no mention of Deschenes's testimony that Gomes had

---

**6.** Walpole was stipulated to be a "more severe institution."

**7.** The full text of the TRO was as follows:

After hearing and argument, it is hereby ordered that: The Defendants shall refrain from conducting any disciplinary hearing according to the Code of Massachusetts Regulations, 103 § 430 *et seq.*, or any proceeding according to Massachusetts General Laws, Chapter 123A § 1, or imposing any sanction or restriction with respect to disciplinary report # 76–83, and Defendants shall refrain from treating Mr. Gomes on account of the

events described in the disciplinary report as other than a normal "new man" general population inmate at MCI-Walpole, until the Court may consider Mr. Gomes' motion for a permanent injunction.

**8.** The student attorney testified that on February 17, 1983 he spoke to Roland Rheault, MCI-Concord Director of Classification, who said that Gomes "had been writing obscene letters to female staff" which he had not seen but which he had heard were "beyond strange." The student testified that Rheault identified the writings as "letters" and not "poems."

inappropriately asked to see her when released, nor did it mention Deschenes's other testimony of conduct leading her to believe that Gomes was making personal overtures. The court noted that the poems were not addressed to Deschenes, that they did not mention her, and that they were not set in prison. "I credit Gomes' testimony that he gave her the poetry to have her correct his grammar and spelling errors (of which the poems are replete)." The court thought that Gomes had sought help from Deschenes rather than from his English teacher because he considered Deschenes a friend. The court found it significant that in the disciplinary report she prepared, Deschenes stated only "that Gomes handed her a folder containing sexually explicit passages" and did not charge "sexual harassment" in so many words. (The court did not mention that the report also charged "insolence towards a staff member" and "[u]se of obscene, abusive or threatening language. . . .") The district court concluded that "the evidence is simply insufficient to support a claim that the incident amounted to a sexual overture justifying the actions taken and the resulting curtailment of the First Amendment right Gomes exercised in writing the poems." The court also found the objective facts were insufficient for prison officials to have a *reasonable* belief that prison security was at stake.

The court permanently enjoined the defendants from,

(a) conducting any disciplinary hearing or proceeding under the Code of Massachusetts Regulations, 103, § 430 *et seq.*, or any proceeding under Mass. Gen.Laws ch. 123A, § 1, or imposing any sanction or restriction with respect to disciplinary report # 76-83;

(b) keeping any record in any file of the disciplinary report, the recommendation for processing under Mass.Gen. Laws ch. 123A, § 1, or any other related information;

(c) keeping Gomes from his classification to MCI Norfolk for any reason relat-

ing in any way to the incident discussed in this opinion.

### III.

#### A. *Mootness*

■ We reject Gomes's suggestion that this appeal is moot. Gomes points out that since the district court's decision he has been returned to MCI-Walpole for other, unrelated disciplinary charges. This renders academic that part of the injunction which bars "keeping Gomes from his classification to MCI Norfolk" for any reason relating to the poetry incident. It does not, however, render other parts of the injunction moot. It is true that, at the time of the trial, Gomes's allegedly retaliatory classification to MCI-Walpole was a central issue. But the injunctive order finally entered, from which this appeal is taken, was not limited to granting Gomes relief respecting his classification. The injunction prohibits prison officials from imposing any sanction or restriction against Gomes relative to the disciplinary report filed by Ms. Deschenes and from keeping any related record or information. Prison officials must, in effect, rid their files of all information concerning this incident, and may never refer to any aspect of the matter. Defendants take vigorous exception to this command, and with Gomes still in their custody, they thus remain engaged in a live controversy with him over the correctness of the injunction. The present appeal is not moot.

#### B. *The Merits*

This is not a case, like some involving claims under the first amendment, where a court is able to rule as a matter of law that a prison's policy or regulation is violative of the Constitution. *Cf. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (rule restricting receipt of books); *Jones v. North Carolina Prisoner's Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (rule restricting prisoner union); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (rule restricting access to journalists); *Procunier*

*v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (mail censorship rule); *Storseth v. Spellman,* 654 F.2d 1349 (9th Cir.1981) (rule restricting inter-institutional mail); *Rudolf v. Locke,* 594 F.2d 1076 (5th Cir.1979) (rule restricting correspondence within segregation unit).

Rather, whether or not Gomes has a constitutional claim here requires interpreting the facts of an extraordinarily enigmatic incident that occurred between an inmate and a young, professionally trained staffer. Ms. Deschenes interpreted the unsolicited handing to her of the romantic, sexually explicit poems, as the culmination of a sexual advance foreshadowed in Gomes's earlier conduct towards her. While the poems were not actually addressed to her, she interpreted them, in the context, as intended to convey an improper message. She accordingly filed a disciplinary report charging violation of several prison rules, and her superiors supported her to the extent of removing Gomes from the general prison population at MCI-Concord—first by administrative segregation and then by transfer to another institution—and setting the disciplinary report down for an administrative due process hearing.

Gomes, and later the district court, took a contrary position. In their views, the poems were innocently supplied to Deschenes for "proofreading," without ulterior purpose or message.

■ While the evidence is scarcely determinative as to either version, there can be no dispute that if the incident was as interpreted by Deschenes, the prison would be entitled to reclassify Gomes and initiate disciplinary action as it did. The first amendment applies in prisons, but must be accommodated to the unusual conditions there. The district court recognized this. It said,

> Defendants have a strong interest in assuring the safety of prison staff and taking immediate action in the case of inmate threats, no matter how veiled. A sexual advance by an inmate on a staff member is not to be taken lightly; a sexual proposition need not ripen into a

physical assault before prison officials can take steps.

Thus if the incident may properly be viewed as a sexual proposition, Gomes's constitutional claim fails, since in the prison setting—unlike the outside—reasonable concerns as to security and discipline are paramount.

■ Much of the difficulty here lies in deciding whose judgment should carry the day in determining whether to treat the incident as a likely sexual proposition or something more innocent. Does the district court simply hold a trial and decide for itself how to interpret the incident, or does it defer in some measure to the judgment of the prison authorities? The answer seems fairly clear. The Supreme Court has indicated that even in the presence of legitimate first amendment concerns, considerable deference is due to the "expert" judgment of prison administrators. The Court has said,

> Prison administrators should be accorded wide-ranging deference in the adoption *and execution* of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra,* [433 U.S.,] at 128 [97 S.Ct., at 2539]; *Procunier v. Martinez, supra,* [416 U.S.,] at 404–405 [94 S.Ct., at 1807]; *Cruz v. Beto, supra,* [405 U.S. 319] at 321 [92 S.Ct. 1079, 1081, 31 L.Ed.2d 263], see *Meachum v. Fano,* 427 U.S. [215], at 228–229 [96 S.Ct. 2532, 2540, 49 L.Ed.2d 451]. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, *in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations,* courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S., at 827 [94 S.Ct., at 2806].

*Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979) (footnotes omitted) (emphasis supplied).

The district court here did not deny the need for "deference" to prison officials, but stressed that deference must not become "blind allegiance." In its view, any restrictions on expression by prison officials had to reflect an "honestly held and *reasonable* belief" (emphasis by the district court) that such restrictions were necessary. The court did not question the honesty of defendants' beliefs, but went on to hold that defendants' construction of the incident as a sexual advance was merely "intuitive" and was unreasonable.

We agree that the issue for a court in a case like this is limited to whether the prison officials were acting in a *good faith and reasonable belief* that the restrictions they were imposing were necessary. The concept of reasonableness, however, must be applied so as to give, in the words of the *Wolfish* Court, "wide-ranging deference" to prison administrators on questions of prison security and discipline. *Id.* A court should not give "reasonable" such a constricted meaning that it includes only the measures the court would take were it running the prison itself. Even if the prison officials' evaluation of an incident is significantly different from the court's, their view is entitled to prevail so long as honestly held and within rational boundaries. As the Court reiterated in *Wolfish*, before a court second-guesses prison officials there must be " 'substantial evidence in the record to indicate that the officials have ·xaggerated their response....' " 441 J.S. at 548, 99 S.Ct. at 1879 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). And in assessing the quality of the evidence, the district court must recognize that prison administrators draw upon an experience peculiar to the institutions they control and to the inmates within. Only recently, the Supreme Court said,

> In assessing the seriousness of a threat to institutional security prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context ... turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 464 [101 S.Ct. 2460, 2464, 69 L.Ed.2d 158] (1981)....

*Hewitt v. Helms*, 459 U.S. 460, 474, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983). Thus while we agree with the district court that mere "intuition" alone would not be a satisfactory basis for action against an inmate, a court may not substitute its own judgment for the evaluations of officials.

Here the district court viewed Deschenes's charge against Gomes as founded on the "merest intuition." "I have nothing more than her intuition that Gomes was attracted to her and her conclusion that the poetry was written for her." The court dismissed the relevance of the "context" Deschenes painted by finding,

> The sum total of the contacts between the two before the poetry incident consisted of two short conversations in Deschenes' classroom and chance encounters in hallways. The last conversation ended on a "friendly note," Deschenes said. Certainly nothing happened which warranted a disciplinary complaint.

Absent from these findings is any reference to Deschenes's testimony concerning Gomes's difficulty in breaking off their earlier counseling relationship. Absent also is any reference to Deschenes's testimony of Gomes's unusual request to reestablish a relationship after he was paroled in August; to uncontradicted evidence that Deschenes had expressed concern at this time to another staffer about Gomes's conduct; and to the incident in the hallway where

Gomes spoke of Deschenes as "lovely" and she threatened him with a disciplinary report.

Instead, the court reiterated its view that "the evidence [was] simply insufficient to support a claim that the [February 3] incident amounted to a sexual overture," and went on to reason that Vose's decision to reclassify Gomes from MCI-Norfolk to MCI-Walpole, "on the basis of Deschenes's report" was similarly deficient. "But for" "the February 3 incident involving his poetry," the court concluded

> [Gomes] would not have been reclassified to Walpole and labelled a sexually dangerous person. The primary issue is ... whether transfer because of that incident amounts to a retaliation for exercise of First Amendment rights. There is nothing about Gomes's conduct apart from the poetry to justify or explain the disciplinary charge precipitating his transfer. Indeed, only the poetry is mentioned in the disciplinary report. The only question then is whether the poetry itself, containing sexually explicit passages and given to a female staff member, is protected by the First Amendment....

In the instant case, the circumstances were not such as to justify the action taken against Gomes; the objective evidence does not support any belief by prison officials that his transfer and segregation for the poetry were necessary to maintain prison security.

■ The primary flaw in this analysis is that it pays no attention to the defendants' right as prison administrators to make judgments concerning questions—including close and difficult questions—within their expertise. Moreover, the court reaches its determination of "no objective evidence" by omitting all mention of the various incidents testified to by Deschenes which preceded the poetry incident itself. We believe the court paid insufficient attention to evidence which supported the defendants' handling of the situation, and that it was clearly erroneous in concluding that the defendants could not, in light of this evidence and of their presumed expertise, have reasonably reacted as they did.

First, as to Deschenes's charge itself, we see no necessary overreaction. Deschenes was a trained if still youthful counselor, with prison counseling experience, testing experience with prisoners, and extensive counseling experience with Gomes himself. There is no evidence of bias or ill-will towards Gomes. She had the training and the knowledge of Gomes personally to make subjective judgments regarding the object behind the delivery of poems. *Hewitt*, 459 U.S. at 474, 103 S.Ct. at 873. More important, she also had objective indicators to rely upon in filing her disciplinary report, contrary to the district court's view. There were, for instance, Gomes's hallway remarks to Deschenes and others, which on one occasion, at least, prompted a warning; Gomes's request to meet with Deschenes outside the prison after his parole; his pressing for a renewed counseling relationship after she told him this was not her role; and his appearance of sadness or depression at the time of the latter episode and when he first handed her the poems. In this context Deschenes could view the poem Gomes chose to place first in the file, "Sexually but interlecually,"—which on its face may fairly be characterized as a proposition by a streetwise man to a sophisticated woman—as containing a message for her. Contrary to the district court's suggestion, Deschenes did not leap to judgment but first sought guidance from the principal and school officer before filing the charge. Nothing in the district court's opinion questions Deschenes's truthfulness, only her judgment.

We do not believe the steps taken by Vose relating to the investigation and hearing were unreasonable. Vose waited for the evidence to come in before forming an opinion. Deschenes was a prison staff member who was plainly concerned and upset by the incident. That alone would have triggered concern by a conscientious superior. His decision to segregate Gomes, first pending the investigation and then the hearing, given the possible threat to Deschenes, was clearly permitted by

*Hewitt,* 459 U.S. 460, 103 S.Ct. 864. Deschenes was at this time working within the prison itself. As to the scheduling of a hearing, this seems a wholly appropriate reaction given the fact that a disciplinary report had been filed by a staff member. Indeed, for Vose to have refused to schedule a hearing would have been extraordinary given Deschenes's complaint.

Whether or not Gomes was in fact guilty of the disciplinary charge itself, we cannot say that Vose overreacted by reclassifying him following the February 3 incident. At the time of the transfer Vose was faced with a prisoner who was possibly guilty of an improper sexual advance on a staff member. The record indicates that the reclassification decision did not rest solely on Vose's construction of that incident, however. Rather Vose relied as well on other information, including Gomes's relationship with and attitude towards Deschenes which existed prior to February 3 but which only came to light thereafter. We see no reason why that information was not relevant to Vose's decision or could not permissibly color Vose's view of Gomes's deteriorating disciplinary record, as Vose testified it did, whether or not these other incidents by themselves were adequate to support a disciplinary charge.[9]

The district court's conclusion that Gomes's reclassification functionally "amount[ed] to a retaliation for [his] exercise of First Amendment rights" is simply not supported by the record. To be sure, "[b]ut for" the "poetry incident" Gomes would not have been reclassified from MCI-Norfolk to MCI-Walpole (his transfer *somewhere* was in any event foreordained). But there is no evidence to suggest that Gomes's poetry as such was the "actual motivating factor" for any of the defendants' conduct following the February 3 inci-

dent. *MacDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979). The district court's analysis on this point blurs the difference between writing sexually explicit poetry in prison—which the parties assume is protected by the first amendment—and handing such poetry unsolicited to a prison employee of the opposite sex in the context presented here. *Cf. Sostre v. McGinnis,* 442 F.2d 178, 202–03 (2d Cir.1971) (protecting the writing of racist literature as opposed to its distribution outside the prisoner's cell), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). The court's suggestion that the disciplinary report does not describe "the incident as one of sexual harassment" seems to us similarly inaccurate and misleading. The disciplinary report sets out various charges including "use of obscene, abusive or threatening language, action or gesture to any ... staff member." The report focuses on the *use* of the poetry for an improper purpose, not the poetry itself.

There is not a shred of evidence suggesting the existence of any prison rule, policy or practice forbidding the writing or circulating of poetry or the like whether sexually explicit or not. Nor does the evidence support an inference that Gomes's reclassification was made with "a retaliatory state of mind," *Ferranti v. Moran,* 618 F.2d 888, 892 (1st Cir.1980), or was motivated by "bad faith." *Layne v. Vinzant,* 657 F.2d 468, 476 (1st Cir.1981). *Cf. Board of Education v. Pico,* 457 U.S. 853, 863, 871, 102 S.Ct. 2799, 2806, 2810, 73 L.Ed.2d 435 (1982) (Brennan, J., plurality opinion) (school board, within its "broad discretion" may not remove books from school library if it *"intended ... to deny respondents access to ideas with which [it] disagreed*

---

9. The suggestion in the district court's opinion that Gomes was *"labelled* a sexually dangerous person" lacks support in the record except in Gomes's subjective judgment. Vose only made a recommendation, contingent upon a guilty finding at the disciplinary hearing, that a psychiatric evaluation be made under Mass.Gen. Laws ch. 123A, § 6. That statute provides broad discretion to prison administrators to rec-

ommend an evaluation of an inmate. Once the process has begun, the inmate is afforded substantial procedural safeguards. The fact that such an evaluation is recommended does not mean that the inmate will be found to be a sex offender. This presumably depends upon judgments outside the control of the official who recommended the evaluation.

**528**

and if this intent was the decisive factor in [its] decision . . . .").

Viewing the record as a whole we believe that the district court erred in finding that prison officials could not reasonably have believed that Gomes's conduct warranted his reclassification and the holding of a hearing on Deschenes's disciplinary charge. Giving appropriate deference to prison authorities, we do not believe there was substantial evidence from which to conclude that what was done was unreasonable. And we find no evidence of any intent by defendants to thwart or limit Gomes's right to write poetry, or to communicate it in a way consistent with prison discipline. In so holding, we do not decide whether the authorities could, had they been allowed to hold the disciplinary hearing, find him guilty of misconduct on the basis of the poetry incident. Decision as to this could only be made with the benefit of the record developed at the disciplinary hearing—and, of course, there is no such record, as the hearing was never held. *See* Section C, *infra*. We therefore reverse the decision of the district court holding that defendants violated Gomes's first amendment rights.

### C. *Enjoining the Scheduled Disciplinary Hearing*

■ We add a comment concerning the issuance of the TRO enjoining the holding of the hearing scheduled for March 4, 1983, on Deschenes's disciplinary report. This was error, reflecting the erroneous assumption that the court should take completely away from prison officials the resolution of a charge of this nature. As the regulations cited in note 5, *supra*, show, this was a hearing affording substantial due process to Gomes. He could have been represented by his attorney there. Set for a date well prior to the trial in the district court, the hearing would in normal course have been concluded over a month before the trial. Courts should be hesitant to use their equitable powers to bar the holding of a hearing of this type in the absence of evidence either that it is being held for an

ulterior purpose, such as harassment, or, at least, that it can serve no proper purpose. *Cf. Morris v. Travisono,* 707 F.2d 28, 32 (1st Cir.1983) (district court did not abuse discretion by not ordering new reclassification hearing where "experience suggest[ed] new . . . hearing would invite further temporizing and denial" and court "ha[d] already given authorities a chance to make the decision").

Regardless of any burdens associated with attending a due process hearing, there are strong reasons of policy not to prohibit officials from holding one where it may serve a proper purpose, since it constitutes the machinery by which they are supposed to resolve disputed charges in a fair manner. Recent constitutional cases stress the importance of hearing processes such as the one here. *See, e.g., Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). To enjoin the holding of due process hearings—to treat such a hearing as itself a species of forbidden conduct—is inconsistent with this policy. Absent special circumstances, the mere holding of a hearing such as this does not constitute an enjoinable species of irreparable harm.

Here it would have made good sense to allow the disciplinary hearing to run its course even though court proceedings (based on the alleged retaliatory transfer to Walpole) had already been instituted, and would themselves go forward notwithstanding. While the disciplinary hearing could not be conclusive, it being up to the court to decide ultimately whether a first amendment violation had occurred, the reasoning and judgment of the prison authorities could be useful components of the court's decision in this regard. As already indicated, in a fact-sensitive incident such as this, involving alternative interpretations of a prisoner's conduct, substantial deference must be paid to the honest and reasonable judgments of prison officials. For this reason, the court here would have benefitted from the records and the results of the scheduled disciplinary hearing.

Had the hearing panel decided that Gomes's conduct was innocent, the court suit might, of course, have been ended then and there. Had the panel reached the opposite conclusion, the district court could have stayed any penalties until it made its own determination, and could perhaps have gained from the hearing records additional information from which to analyze the defendants' reasoning, conduct and motivation. Further insight might have been provided as to whether prison authorities took offense at the poetry per se or whether they were in fact apprehensive of Gomes's conduct towards the female staffer. We can perceive no good reason to have prevented prison authorities from proceeding with the hearing, in order to arrive at their own final determination of the truth or falsity of Ms. Deschenes's charge against Gomes.

This is not to say that Gomes had to await the hearing before bringing this suit. Because the allegedly retaliatory transfer to Walpole had already occurred, he had sufficient basis to sue. *See MacDonald v. Hall*, 610 F.2d 16 (1st Cir.1979).[10] We say only that the court had little to gain, and much to lose, by cutting off a hearing which might have assisted it in weighing the constitutional issue.

### D. *Other Proceedings*

In conclusion, we reiterate our earlier statement that we do not decide here whether the defendants could, had they been allowed to hold a disciplinary hearing, have found Gomes guilty of misconduct on the basis of the poetry incident. This could be determined only in light of an actual finding and any record developed at the future disciplinary hearing. It follows that a decision by defendants to discipline Gomes, made after a disciplinary hearing, could conceivably give rise to another section 1983 action at which the court would have to make new credibility judgments and further assessments of the officials' reasonableness and motivation in imposing disciplinary sanctions.

*The injunction is vacated.*

#### Appendix
Sexually but interlecually

Excuse me miss lady

but do you design your own clothes?

Are you a model by trade?

That hair style your wearing is really quite laid.

I bet your personallity is also a match.

You look so sweet woman so tempting to snatch.

I'd like to get to know you and find out your name.

So I can sharpen up my ego and get set for the go.

If you got to know me you'd really love my style.

So lets order up some drinks and then rap for while.

Hey I love the way you walk,

You really know how to glide is that called the Shake and Bake the way you move from side to side and the perfume your wearing really stirs up my soul.

You seem really safisticated and you definitlly play the role.

See I'm a gentleman of leisure looking for a lady of the night and I'm trying to have you woman with all of my might.

They call me the pimps threat and the hoes pet.

When I'm in my gangster lean it's pimps in the front hoes in the back and punks in the trunk when I'm on the scene.

I like to have my pimp dust when I'm running round on the case.

---

**10.** A different question would have arisen had the transfer not occurred first and had Gomes sued upon the mere filing of the unresolved disciplinary report. Arguably a mere disciplinary report creates no cognizable harm. *Cf.* *Raper v. Lucey*, 488 F.2d 748, 751 n. 3 (1st Cir.1973) (while exhaustion of remedies is not required under section 1983, ripeness is necessary).

So let's get a blow an then we'll go up over and around to my place.

I can tell by your smile you want to stay awhile.

So come on and step out of those clothes.

That four hundred dollar flash is just enough cash women you'll really be glad that you chose.

Now that I'm payed meet a tool of my trade, as you stare with hungery eyes.

Just open up wide let me float deep inside and swim in the moistness of your sweet sexy thighs.

Once in awhile I have to peek at this under cover freak who was so casual when we first met.

She'll probablly get up rappin interlecually as if nothing happened and just might expect me to forget.

The hoes are skitso to heart and superb in each part one sexual and a interlectual side, one sided filled with fire and laced with desire the other filled with elegance and pride.

I love you, you tell me as I knew it would be from the moment you saw me on the set.

I'm numero uno and I know that you know.

I'm as live as your ever gonna get.

I mean how could you lose with the insant funk I use.

I'm truly a thoroughbread to heart.

I'll treat you like gold specially with the assets you hold lets go out and each play our part.

Say you really look mean when your down on the scene. You really know how to strut that stuff.

I'm just gonna cruise see if theres others who'll choose. You find me when you made enough.

Say theres Johnny Ford driving a chord that boy stays pressed all the time and theres wonder Roy from good pimping stock checking so much fast money it's a crime.

Sometimes some of my foes be harrasing my hoes so I run down and put them in check and if they don't want to rap.

I just give them a slap or I'll try and break his fucken neck.

Just. riden em down while cruising round town before I go back to the pad.

I sip me a drink and sit down and think.

I got to give it to ya Justin you are bad.