WILLIAM LANGTON *vs.* SECRETARY OF PUBLIC SAFETY[1] &
others.[2]

No. 92-P-1835.

Suffolk. December 16, 1993. - July 11, 1994.

Present: KASS, GILLERMAN, & GREENBERG, JJ.

*Practice, Civil,* Summary judgment, Standing. *Civil Rights,* Availability of
remedy, Coercion. *Imprisonment,* Enforcement of discipline.

In a civil action in which a State prison inmate claimed that his Federal
and State constitutional rights to free speech were violated by prison
officials' forcing him to submit to a psychological examination because
the prisoner had sent a letter to the Secretary of Public Safety criticiz-
ing prison conditions, the documents presented on the defendants' mo-
tion for summary judgment demonstrated disputed material facts with
respect to the inmate's claims under both the Federal and State civil
rights acts; the matter was remanded for trial. [18-20]
A State prison inmate did not have standing to assert a claim under 42
U.S.C. § 1983, or a claim challenging regulations of the Department of
Correction, arising from prison officials' alleged censorship and confis-
cation of certain video films, where the plaintiff disavowed any personal
interest in the films. [20-21]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 27, 1991.

The case was heard by *Charles F. Barrett,* J., on a motion
for summary judgment.

The plaintiff, pro se.

*Michael Cohen* for the defendants.

GREENBERG, J. In this complaint, the plaintiff, William
Langton, an inmate at the North Central Correctional Insti-

---

[1] Thomas Rapone.

[2] The Commissioner of Correction; the Superintendent of the North
Central Correctional Institution (NCCI); the Deputy Superintendent of
NCCI; a captain at NCCI; and a psychologist assigned to NCCI.

tution (NCCI) at Gardner, alleges that the Secretary of Public Safety (Secretary) and other officials of NCCI violated his Federal and State constitutional rights to free speech by forcing him to submit to a psychological examination because he sent a letter to the Secretary criticizing prison conditions. He also contends that his fellow prisoners' free speech and due process rights were violated when prison authorities censored and confiscated certain video films. The plaintiff seeks declaratory, injunctive and monetary relief. Upon the defendants' motion, summary judgment entered in their favor. Because the record, as shown by the documents presented on the motion for summary judgment, reveals disputed material facts on some of the plaintiff's civil rights claims, we vacate part of the judgment, but affirm the judgment with respect to the plaintiff's lack of standing to raise a censorship claim.

The plaintiff's principal claim is that he was coerced, under threat of lock-up, to undergo a psychological examination and that during the examination other threats were made to him, and, therefore, his rights to free speech under the First Amendment to the Federal Constitution and 42 U.S.C. § 1983 (1988), the Federal Civil Rights Act,[3] were violated. He further alleges that these actions constituted "force, threats, coercion and intimidation" under G. L. c. 12, §§ 11H and 11I, the State Civil Rights Act.

Among the materials submitted by the plaintiff in opposition to the summary judgment motion is an impassioned letter penned by the plaintiff to the Secretary dated October 1, 1991, in which the plaintiff complains about censorship of video films which had been previously authorized by prison officials for the inmates' entertainment. The full text of the letter is reproduced in the appendix to this opinion. To the Secretary, the "threatening" content of the letter raised the

---

[3]Title 42 U.S.C. § 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the parties injured."

question whether the person writing such things could be in his right mind. As a result, the Secretary determined that a psychological evaluation of the plaintiff was in order.

On October 31, 1991, the defendant Richard Canning, an officer at NCCI, spoke with the plaintiff and ordered him to see an NCCI staff psychologist. After the plaintiff received a reply from the superintendent reiterating approval of the policy allowing the censorship, the plaintiff again wrote to the superintendent informing him of Canning's directive and requesting that his counsel be present at the psychological examination.[4] After one failed attempt, the plaintiff was interviewed on November 21, 1991, by the defendant Kahn, a psychologist. Kahn found that the plaintiff did not suffer from any psychological problems.

In dispute are the following facts. The plaintiff asserts that on two occasions he was threatened in order to secure his compliance with the directive to submit to a psychological examination. The plaintiff set forth, with sufficient specificity to raise as factual issues, the details of these threats, both in his verified complaint and in his affidavit supporting his opposition to summary judgment. See *Pederson* v. *Time, Inc.,* 404 Mass. 14, 16-17 (1989). First, the plaintiff alleged that on October 10, 1991, at 11:25 A.M., defendant Canning came to the plaintiff's living area and informed him, inter alia, "[t]hat failure to comply with [the] order would result in the [p]laintiff being placed in a strip cell, naked, on suicide watch, until such time as he complied," and "[t]hat in fact, proceedings may well be commenced under the provisions of [G. L. c. 123] because of the letter of [October 10, 1991]." Second, on November 21, 1991, during his psychological exam, defendant Kahn "informed [the p]laintiff that he was not to write any more letters, that to do so would be placing himself in jeopardy of a trip to the 'bug house' "; and that "he did not have to speak with him, but that if he refused he

---

[4]Plaintiff's counsel was not notified of either of the scheduled examinations and, therefore, was not present at the ultimate interview of the plaintiff by the prison psychologist.

would place himself in danger of lock-up, and could 'kiss any chance of parole good bye.' "

As a return volley, an affidavit was proffered by the Secretary, indicating that the psychological examination of the plaintiff was not taken to punish or to retaliate, but rather to reevaluate the plaintiff's mental health status; and affidavits were proffered by defendants Canning and Kahn, disclaiming the threats alleged in the plaintiff's complaint.

The question raised by the opposing affidavits is whether the statements attributed to the officials by the plaintiff were made. Cf. *Sheehy* v. *Lipton Indus., Inc.,* 24 Mass. App. Ct. 188 (1987). A disputed issue of material fact is to be resolved at trial by the trier of fact, not determined on a summary judgment motion. *Good* v. *Commissioner of Correction,* 417 Mass. 329, 332-333 (1994). *Flesner* v. *Technical Communications Corp.,* 410 Mass. 805, 808-809 (1991).[5] What remains is the question whether the factual dispute was material. See *Beatty* v. *NP Corp.,* 31 Mass. App. Ct. 606, 607-608 (1991).

1. *Langton's individual claims.*

(a) *Federal civil rights claim.* It is premature to decide the defendants' claim that, as a matter of law, the plaintiff's First Amendment rights were not interfered with by virtue of the defendants' actions in response to the plaintiff's letter. If the psychological examination was a reprisal for making complaints about prison conditions, there may be a "clearly established" constitutional right that was violated. Compare *Ross* v. *Reed,* 719 F.2d 689, 695-696 (4th Cir. 1983). By addressing specific grievances to the appropriate officials, the defendants' actions could have been an attempt to forestall and punish a legitimate effort by the plaintiff to trigger official action.

---

[5]See also *Olivera* v. *Nestle P.R., Inc.,* 922 F.2d 43, 49 (1st Cir. 1990) ("The district court weighed this evidence against countervailing evidence by the employer, discounted it and found it wanting. In doing so, it violated two summary judgment precepts: it did not look at the evidence in the light most favorable to the plaintiff, and it weighed the evidence and determined the truth of the matter. This it could not do").

"[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law[6]; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt* v. *Taylor*, 451 U.S. 527, 535 (1981). Section 1983 should be "liberally and beneficently construed . . . [and] be broadly construed against all forms of official violation of federally protected rights." *Monell* v. *New York City Dept. of Social Serv.*, 436 U.S. 658, 684, 700-701 (1978), quoted in *Dennis* v. *Higgins*, 498 U.S. 439 (1991).

(b) *State civil rights claim.* The State Civil Rights Act, G. L. c. 12, §§ 11H-11I, affords a private right of action for violations interfering "by threats, intimidation or coercion . . . with the exercise or enjoyment by any other person or persons or rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." G. L. c. 12, § 11H. For a claim to lie under the Act, the plaintiff must prove interference with some underlying right by the use of threats, intimidation or coercion. See *Appleton* v. *Hudson*, 397 Mass. 812, 817 (1986).

"[P]risoners have a right, subject to reasonable limitations of time and place, to petition prison authorities" for the redress of grievances. *Stovall* v. *Bennett*, 471 F. Supp. 1286, 1290 (M.D. Ala. 1979). See *Cruz* v. *Beto*, 405 U.S. 319, 321 (1972) ("persons in prison . . . have the right to petition the Government for redress of grievances"). The right emanates from the First and Fourteenth Amendments to the Federal Constitution, art. 9 of the Massachusetts Declaration of Rights, and State law (see, e.g., G. L. c. 30A, §§ 1-8;

---

[6]The requirement of 42 U.S.C. § 1983 that the challenged actions be under color of State law has been treated as equivalent to the State action requirement of the Fourteenth Amendment to the Federal Constitution. *United States* v. *Price*, 383 U.S. 787, 794 n.7 (1966). See *Casa Marie, Inc.* v. *Superior Court of P.R.*, 988 F.2d 252, 258-259 (1st Cir. 1993).

G. L. c. 124, § 1[*i*]). Accordingly, it is a "secured" right, as required by the State Civil Rights Act. See *Bell* v. *Mazza*, 394 Mass. 176, 182-183 (1985), and cases cited.

Behind prison walls the right to petition is limited because "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Lovell* v. *Superintendent N. Cent. Correctional Inst.*, 26 Mass. App. Ct. 35, 37 (1988), quoting from *Pell* v. *Procunier*, 417 U.S. 817, 822 (1974).

Even a limited right to petition for redress of grievances is elusive, however, if the petitioner must undergo, as a consequence of such an exercise, compulsory psychological examinations, solitary confinement, threatened procedures under G. L. c. 123, or the potential loss of parole. Here, the plaintiff's claim is that the defendants, in their official capacities, retaliated against him with threats of retribution, described above, to compel his silence. If proved, that conduct would satisfy the coercive conduct element of the plaintiff's claim under the State Civil Rights Act. See *O'Connell* v. *Chasdi*, 400 Mass. 686, 692-694 (1987). See and compare *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 823 (1985); *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 718-720 (1989); *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 98-101 (1987); *Layne* v. *Superintendent Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 158 (1989). If the allegations in the plaintiff's affidavit are true, they are sufficient to constitute threats, coercion and intimidation under the Act.

2. *Prisoners' claims.*

(a) *Federal claims.* In addition, the plaintiff raises claims under 42 U.S.C. § 1983 in regard to the censorship and confiscation of video films. With respect to these claims, the judge found that the plaintiff lacked standing because, in his letter, he stated that he "did not view the films, ha[s] no particular interest in them, or for that matter any other film." Under the Federal Civil Rights Act, the plaintiff must show that he has a "personal stake in the outcome," *Baker* v.

*Carr*, 369 U.S. 186, 204 (1962), and that "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College* v. *Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982). "A prisoner cannot bring claims on behalf of other prisoners." *Martin* v. *Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985). We agree with the motion judge that the plaintiff lacks standing.[7]

(b) *State law claims.* We assume that the plaintiff invokes G. L. c. 30A, § 7, collaterally with G. L. c. 231A,[8] to challenge the regulations of the Department of Correction providing the basis for the censorship of the videotapes. As previously discussed, because the plaintiff disavowed any interest in the video films censored, or any other video films, he has no standing to challenge the regulation. See *Baker* v. *Carr, supra*; *Valley Forge Christian College* v. *Americans United, supra*; *Martin* v. *Sargent, supra.* Despite the fact that G. L. c. 231A "has long been construed broadly as to the existence of a controversy," *Pistorino & Co.* v. *Style Leather Co.*, 361 Mass. 464, 468 (1972), "controversy in the abstract is not sufficient to allow a plaintiff to invoke the declaratory judgment remedy." *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 293 (1977).

Accordingly, that portion of the summary judgment dismissing the plaintiff's claim with respect to the regulation permitting censorship of videotapes is affirmed; that portion dismissing the plaintiff's claim with respect to the violation of the plaintiff's civil rights brought pursuant to G. L. c. 12,

---

[7]Any challenge, in the abstract, based upon the constitutionality of censoring video films would similarly fail for lack of a case or controversy, as there can be no showing of "injury in fact." *Valley Forge Christian College* v. *Americans United for Separation of Church & State*, 454 U.S. 464, 471-472 (1982). See *Darring* v. *Kincheloe*, 783 F.2d 874, 877-878 (9th Cir. 1986).

[8]General Laws c. 30A, § 7, states, in pertinent part, that "judicial review of any regulation . . . may be had through an action for declaratory relief in the manner and to the extent provided under [G. L. c. 231A]." General Laws c. 30A, § 1A, provides that the "department of correction shall be subject to sections one through eight, inclusive."

§§ 11H-11I, and 42 U.S.C. § 1983, for the defendants' actions after receiving the grievance letter, is vacated and the case is remanded to the Superior Court for a trial.

*So ordered.*


APPENDIX.

The text of the letter, addressed to Thomas Rapone, Secretary of the Department of Public Safety is reproduced without alteration below:

"Dear Sir[:]

"Today I learned some distressing information. That various female employees have objected to material contained in videos. That as a result of these employee complaints, two video tapes were confiscated, turned over to the superintendent. My understanding is that the films in question were titled Blood Sucker Freaks and Last Call.

"I personally did not view these films, have no particular interest in them, or for that matter any other film. My problem is that I have serious objection to any individual deciding what I may read, write, watch, etc.

"The first question is, what were employees doing watching video tapes? I would of thought that they were here to work.

"We have an institution of a 1,000 men, many of whom have a host of personal problem, family crisis, marriage problems, facing loss of custody of their children, and a 1,000 and one other human tragedies. These type of issues need the attention of case workers, which ironically they have no time for.

"Lets be concerned with thing of substance, like how to prevent correction officer from raping inmates! Or how to identify an employee who would draw a weapon on others in the parking lot. Or those employees who have a propensity for selling drugs within our institution.

"Lets find the means of making visits with family and loved ones, a pleasure rather than a punishment. The Department has a philosophy and goal of aiding inmate in maintaining family ties. The reality is that we are taught, that you may visit so long as you are willing to tolerate, and observe people you love being accosted, by those in authority.

"We accept such treatment, why, because we are without moral fiber. Our desire to see and be with those we love and care for, blinds us to the abuse which we compel them to endure, and endure they do, solely because they to have the human weakness of caring for some one. But these human beings only offence was and is to care.

"Lets be concerned about inmates who are unable to receive the proper medication from the nursing staff or to receiving it at all in some instances.

"Or how about being ill and having to see a doctor that can't even speak the language. How he becomes irritated when the inmate is unable to understand Arabic or some other foreign language.

"Walk through the camp, and watch officers concerned with the color of your hat, when 100s are idle, others are dying of AIDS, many more with serious mental illnesses and no treatment.

"Watch and listen as inmate tell of how they were searched for milk or a fork, as officers walk by with bags full of milk for their coffee, from the same source, and more than likely the same milk that the inmate attempted to save.

"Watch and listen as the inmates describe how it took five minutes to get and ambulance for an employee and twenty five for an inmate.

"Visit the dining room as the employees see how fast they can run 1,000 people through. Listen how the employees talk to the inmates, degrade and abuse. See the green bread, or listen how the cooks ordered the inmates to boil spoiled meats so that it did not smell so bad.

"Now female employees want to decide what movie I will or will not see. Next I'll be prohibited from thinking.

"They have also decided that they desire to watch inmate while they defecate and perform various other bodily functions.

"And when all is said and done, you declare us rehabilitated, and return us to society.             .

"Personally, i've prohibited my Son and family from visiting, except in an emergency, have not entered the dining room in a year.

"I have dealt with my tragedy, and will not be part or a participant in yours.

"It is true, I have victims in my past, at most a hand full. This I have lived with. But if society ever discovers what you have done, what you have created, the tens of thousands injured, it will be the end.