Garsh, J.
The plaintiff, Kevin Grayhawk LeMay (“LeMay”), brings this action against Larry Dubois, the Commissioner of Correction (“Dubois” or “Commissioner”), William Coalter, (“Coalter” or “Superintendent”), the Superintendent of the Massachusetts Correctional Institution at Shirley (“MCI Shirley”), Sergeant Spadafora, a disciplinary officer at MCI Shirley (“Spadafora”), and Sergeant Karen Collins, a hearing officer at MCI Shirley (“Collins”). LeMay claims that the defendants violated his federal and state constitutional rights by disciplining him for sending a letter to the Secretary of Public Safety.[3]
This action is before the court on the plaintiffs motion for summary judgment and the defendants’ cross-motion for summary judgment. For the following reasons, each motion is DENIED in part and ALLOWED in part.
BACKGROUND
On or about April 19, 1995, LeMay, a prisoner at MCI Shirley, sent a letter to the Secretary of Public Safety, Kathleen O’Toole (“Secretary OToole”), together with a package of materials; the letter asks the Secretary to intervene in order to defuse a dispute at MCI Shirley over the confiscation of inmate property. The package of materials contained a summary of lawsuits which had arisen as a result of the confiscation of inmate property, and it specifically referenced a 1994 lawsuit brought in the Superior Court by inmate Kevin Sawyer. In the Sawyer action, on June 15, 1994, the Commissioner of Correction and the Superintendent of MCI Shirley were permanently enjoined from confiscating inmate property or threatening to do so in violation of the “Grandfather Clause” contained within the Department of Correction’s Property Policy’s “Standing Operating Procedure,”[4] which allowed prisoners to possess certain property banned by the inmate property policy promulgated in December of 1993 by the Department. The new property policy, found in 103 C.M.R. §403, was more restrictive and would force prisoners to give up property which they were previously permitted to possess.
*291 LeMay’s summary also noted that, on August 12, 1994, in a separate action brought in the Superior Court by inmate Carl Drew, a different Superior Court judge, dissolved a 1992 injunction issued in the Drew action preventing the repeal of the Grandfather Clause; the Department of Correction (“DOC”) was ordered to store disputed property until the resolution of the litigation. In a February 1, 1995 memorandum to all the superintendents, Dubois interpreted the August, 1994 order to mean that the DOC could enforce its inmate property policy without concern for the Grandfather Clause and ordered all superintendents to fully comply with the DOC’s inmate property policy found in 103 C.M.R. 403 by May 1, 1995. Coalter then, on March 16, 1995, wrote a memorandum to all staff and inmates at MCI Shirley stating that, as a result of the court order in Drew, “the Grandfather Clause is no longer in effect. V His memorandum informed staff and inmates at MCI Shirley that any item not in compliance with the then current property list had to be sent out of the institution.
The two-page document accompanying the letter to Secretary O’Toole summarized the litigation described above and also stated that LeMay and other prisoners believed that the Commissioner and Superintendent of MCI Shirley were violating the permanent injunction issued in the Sawyer case. He further stated that prisoners were not inclined to turn over property that they believed remained protected by the Grandfather Clause and by the injunction issued in Sawyer’s case and that confiscation of that property might involve the use of force by correctional officers. He also indicated that, from his point of view, the situation at MCI Shirley was not “a prisoner against Correctional Officer matter,” but involved the safety of all the people involved. LeMay expressed his belief that the prisoners and correctional officers were caught between Dubois and the courts. Finally, LeMay advised Secretary OToole that the prisoners were trying to resolve the property dispute through litigation, but that prison officials were pitting prisoners against correctional officers and creating “an atmosphere designed to produce violence and injuries to both sides, with both being the loser.”
In addition to LeMay’s two-page summary of litigation regarding confiscation of prisoner property, enclosed with the letter are copies of the Sawyer and Drew decisions and the February 1, 1995 and March 16, 1995 memoranda from Commissioner Dubois and Superintendent Coalter. In the body of his letter, LeMay asked Secretary OToole to intervene in the situation to halt the “unlawful acts” by the Commissioner and the Superintendent. He went on to say that “[s]hould you decline to act, the safety and well being of correctional officers and inmates at MCI Shirley Medium will be in jeopardy.”[5] LeMay did not send a copy of his letter to Dubois or to anyone at MCI Shirley. Secretary OToole chose to fax LeMay’s letter to Depuly Thompson in the Commissioner’s office on April 27, 1995, and Deputy Thompson asked Mark Blette (“Blette”), an inner perimeter security officer at MCI Shirley, to investigate. That day, LeMay was interviewed about the letter by Blette. Blette deemed the letter to be threatening because of the sentence warning that the “safety and well being of correctional officers and inmates at MCI Shirley will be in jeopardy” should the Secretary decline to act.
After the interview, Disciplinary Report 95-0886 was issued because it was determined that the letter to OToole was “of a threatening nature.” LeMay was placed in the Special Management Unit, a segregation unit, at MCI Shirley. The report, Disciplinary Report 95-0886, charged LeMay with six offenses, including the “use of obscene, abusive or threatening language, action, or gesture to any inmate, staff member, or visitor.”[6]
LeMay remained in the segregation unit throughout the disciplinary process.[7] On May 19, 1995, a Disciplinary Board hearing was held presided over by Collins. LeMay pled not guilty to the charges and stated that his letter and the materials which accompanied the letter were intended to express his concern over the situation involving the confiscation of prisoner property and were not meant as a threat. LeMay presented the Disciplinary Board with a copy of the litigation in the Superior Court concerning the confiscation of property, character letters on his behalf, and a copy of Langton v. Secretary of Public Safety, 37 Mass.App.Ct. 15 (1994), a case involving action taken by prison officials in response to another inmate’s sending an allegedly threatening letter to the Secretary of Public Safety.
Collins found LeMay guilty of the “use of obscene, abusive or threatening language, action, or gesture to any inmate, staff member, or visitor.” The hearing officer’s determination of guilt was based on the fact that LeMay admitted sending the letter and her reading of that letter as one “clearly threatening in nature.” No other investigation was done. Collins recommended a sanction of fifteen days isolation, reclassification, and the forfeiture of fifty days of statutory good time credits. Collins wrote in the disciplinary report that “[t]he sanction is to deter [LeMay] from sending any more letters similar in nature.”
LeMay appealed the findings of the Disciplinary Board to the Superintendent. That appeal was denied on June 8, 1995. On June 21, 1995 a Classification Board hearing was held at MCI Shirley; the Classification Board recommended transferring LeMay to North Central Correctional Institution (“NCCI”) based solely on Disciplinary Report 95-0886. On July 3, 1995, the Superintendent approved the Disciplinary Board’s recommended forfeiture of fifty days of statutory good time credit, but recommended that LeMay be transferred to Old Colony Correctional Center (“OCCC”), a facility with a higher security rating than MCI Shirley. *292 The Commissioner ordered that LeMay be reclassified to OCCC on July 13, 1995 based solely on the disciplinary report. LeMay was transported to OCCC the next day. On July 24,1995, the Commissioner ordered the forfeiture of fifty days of good time credits which LeMay had accrued.
On September 14, 1995, LeMay commenced this action alleging that the disciplinary action taken against him based upon his letter to Secretary O’Toole violated his state and federal constitutional rights to freedom of expression and to petition the government for redress of grievances. LeMay also alleges that the guilty finding and the imposition of sanctions are not supported by sufficient evidence, violating his federal and state rights to due process.[8]
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and where the moving part is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
A party moving for summary judgment who does not bear the burden of proof at trial can demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party is unable to submit proof of that element at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
The nonmoving party cannot defeat the motion for summary judgment, however, by resting on the pleadings and mere assertions that facts are disputed. Lalonde v. Eissner, 405 Mass. 207, 209 (1989). Once the moving party has met its burden, the nonmoving party must respond by alleging specific facts demonstrating the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17.
I. 42 U.S.C. §1983
Not all violations of constitutional rights entitle a plaintiff to seek relief under 42 U.S.C. §1983. If a judgment in a §1983 action necessarily would imply the invalidity of the disposition rendered by a prison disciplinary board, such a suit cannot be maintained if the underlying disciplinary board finding has not already been invalidated.
In Heck v. Humphrey, 512 U.S. 477 (1994), the Supreme Court held, as follows:
[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court’s issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under §1983 (emphasis in original) (citations omitted).
512 U.S. at 486. Accordingly, if a state prisoner seeks damages in a §1983 suit, it must be determined whether the plaintiffs action, if successful, would demonstrate the invalidity of any outstanding criminal judgment against the plaintiff; if so, the action may not proceed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.
In 1997, the Supreme Court applied the holding in Heck to a section 1983 claim for damages and declaratory relief brought by a prisoner who challenged the procedures used to deprive him of good time credits. Edwards v. Balisok, 117 S.Ct. 1584 (1997). In Edwards, the prisoner claimed that the hearing officer at his disciplinary proceeding had concealed exculpatory evidence and refused to ask specified questions of a witness, denying him the right to present evidence in his defense. Id, at 1587. The Court held that since even a favorable ruling on a claim challenging only the procedures used in a disciplinary hearing could necessarily imply the invalidity of the disciplinary board’s judgment, the claim was not cognizable under §1983. Id. at 1588. The inmate in Edwards had failed to comply with procedural requirements for appealing the adverse disciplinary board finding. Moreover, the Court emphasized that a §1983 action may not be stayed while the plaintiff seeks restoration of good time credits by invalidating the disciplinary proceeding. Id. at 1589. Either the action is cognizable under §1983 at the time it is brought, or it should be dismissed. Id.
Although the plaintiff argues that the rule in Heck and Edwards does not apply to §1983 claims filed in state court, nothing in the language or logic of those cases limits the rule to state prisoners filing suit in federal court. See e.g., Day v. Zubel, 922 P.2d 536, 539 (Nev. 1996). Neither Heck nor Edwards rely on principles of comity; instead, they construe the scope of a federal statutory cause of action. In reaching the result it did, the Supreme Court in Heck analogized the requirement that the conviction be invalidated to the common law rule barring tort plaintiffs from bringing collateral attacks on their outstanding criminal convictions by way of suits for malicious prosecution. Heck, 512 U.S. at 484. Further, the Court stated that §1983 requires a plaintiff to prove actual, compensable, injury, which “does not encompass the ‘injury’ of being convicted and imprisoned (until his conviction has been overturned).” Heck, 512 U.S. at 487, n.7 *293 (emphasis in original). A §1983 claim can be brought either in state or federal court, but different substantive rules are not applied.[9] Howlett v. Rose, 496 U.S. 356, 376 (1990) (a state court entertaining a §1983 action must adhere to federal interpretation of the statute).
In the instant case, LeMay claims that the guilly finding by the Disciplinary Board and the sanctions that flowed from that guilty finding violated his constitutional rights. Any finding by this court in the context of a suit for damages that the defendants violated the plaintiffs constitutional rights necessarily would imply the invalidity of the deprivation of good time credits and the Disciplinary Board’s guilly finding. When this suit was commenced, the punishment meted out to LeMay as a result of the Disciplinary Board finding had not been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court’s issuance of a writ of habeas corpus. Therefore, the defendants are entitled to dismissal of plaintiffs §1983 claim for damages.[10]
To the extent that the complaint seeks injunctive relief under §1983 predicated upon the invalidity of Disciplinary Report 95-0886, it also may not be maintained. A request for prospective injunctive relief is cognizable under §1983 when such relief does not imply the invalidity of a previous loss of good time credits or other sanctions. Edwards, 117 S.Ct. at 1589.[11] See also Preiser v. Rodriguez, 411 U.S. 475 (1973) (state prisoner seeking restoration of good time credits may not obtain equitable relief under §1983). Here the requested injunctive relief — enjoining the forfeiture of good time credits based upon the Disciplinary Report, enjoining defendants from placing LeMay in any institution higher than MCI Shirley based on that report, and expunging the Disciplinary Report — would, if granted, imply the invalidity of the Disciplinary Board finding that LeMay is guilty of sending a threatening letter. Accordingly, the entirety of plaintiffs Section 1983 claim must be dismissed.
II. Certiorari
A. Construction of Complaint
The proper vehicle for an inmate to challenge the validity of an adjudication in a prison disciplinary proceeding is an action in the nature of certiorari pursuant to G.L.c. 249, §4. Hill v. Superintendent, M.C.I., Walpole, 392 Mass. 198, 199 n.2, rev'd on other grounds, 472 U.S. 445 (1985). The function of a writ of certiorari is to correct errors of law committed by a quasi-judicial tribunal, such as a prison disciplinaiy board, which are “so substantial and material that, if allowed to stand, they will result in manifest injustice to a petitioner who is without any other available remedy." Johnson Products, Inc. v. City Council, 353 Mass. 540, 541, n.2 (1968). See also Hill, 392 Mass. at 201 (prison inmate is entitled to judicial review of sufficiency of the evidence underlying the disciplinary board’s findings resulting in deprivation of good time credits).
While it is true, as the defendants argue, that LeMay did not expressly seek certiorari review in his complaint, nevertheless, a complaint should not be dismissed if it appears that the plaintiff may be entitled to any form of relief, even if, as here, the particular theory on which he relies is not appropriate. Nader v. Citron, 372 Mass. 96, 104 (1977). LeMay asserts that the actions of the Disciplinary Board violated his state and federal constitutional rights, and his complaint seeks declaratory relief and injunctive relief as well as damages. He alleges that the finding that he was guilly of the offense contained in Disciplinary Report 95-0886 is not supported by the evidence. Such a claim is sufficient to state a cause of action in the nature of certiorari. Courts routinely have treated a claim like LeMay’s as one in the nature of certiorari pursuant to G.L.c. 249, §4 even when the complaint does not mention that statute or use the word “certiorari.” See, e.g., Murphy v. Superintendent, M.C.I., Cedar Junction, 396 Mass. 830, 833 (1986) (construing prisoner’s complaint for declaratory and injunctive relief as an action in the nature of certiorari); Hill 392 Mass. at 199, n.2 (complaint entitled “writ of habeas corpus ad testificandum” treated as civil action for certiorari pursuant to G.L.c. 249, §4); Pidge v. Superintendent, M.C.I., Cedar Junction, 32 Mass.App.Ct. 14, 17 (1992) (claim for declaratory relief treated as an action in the nature of certiorari); McLellan v. Commissioner of Correction, 29 Mass.App.Ct. 933, 934 (1990) (rescript) (complaint for declaratory relief pursuant to G.L.c. 231A treated as a civil action in the nature of certiorari); Cepulonis v. Commissioner of Correction, 15 Mass.App.Ct. 292 (1983) (construing inmate complaint as seeking review in the nature of certiorari under G.L.c. 249, §4).
B. Statute of Limitations
The defendants argue that, even if LeMay’s complaint were to be construed as seeking relief in the nature of certiorari, such a suit is time-barred. Certiorari claims must be brought within sixty days after the proceeding being challenged. G.L.c. 249, §4. A plaintiffs failure to do so mandates dismissal of the action. Pidge, 32 Mass.App.Ct. at 18.
LeMay filed his complaint in Superior Court on September 14, 1995. The defendants maintain that the time within which LeMay was required to file a certiorari petition commenced on June 8, 1995, the date on which the Superintendent denied the plaintiffs appeal of the findings of the Disciplinary Board. Plaintiff claims that he had sixty days from July 24, 1995, the date on which the Commissioner ordered the forfeiture of the fifty days of good time credits.
The case law supports LeMay’s position that his claim is not time-barred. For example, in Pidge, the *294 disciplinary board hearing that resulted in sanctions took place on April 17, 1989; the superintendent denied the plaintiffs appeal from the disciplinary board’s findings against him on June 1, 1989, an act which the Court characterized as the“last administrative action regarding plaintiffs disciplinary sanctions.” 32 Mass.App.Ct. at 18. ‘The last administrative action resulting in [plaintiffs] classification to a segregated unit based upon the disciplinary proceedings occurred on June 30, 1989" when the Commissioner approved the placement. Id. The plaintiff in Pidge did not file his complaint until October, 1989. The Court, after reviewing the chronology, held that the plaintiff had not filed his action until ’’two months after the expiration of the sixty-day limitations period." Id. The Court, thus, calculated the limitations period from June 30, when the Commissioner approved the placement, a month after the superintendent had denied the appeal. If, as defendants contend, the only critical date is that on which the appeal was denied, the Court would have referred to the plaintiff as not having filed his action until “more than two months after the expiration” date and not “two months after." In Medeiros v. Commissioner of Corrections, No. 92-P-1746 (Massachusetts Appeals Court, June 23, 1994), the Court similarly calculated the statute of limitations from the “last administrative action by the Commissioner concerning good time forfeitures” and not from the date on which the plaintiffs appeal of a guilty finding at the disciplinary board hearing was denied. [12]
Here, the last administrative action based upon the prison disciplinary hearing took place when the Commissioner approved the forfeiture of good time credits. Considering that the purpose of certiorari is to provide a remedy to a prisoner where none would otherwise exist, an inmate should not be required to file suit within sixty days of the denial of an appeal to the Superintendent if there has been a recommendation for good time credit forfeiture, but the Commissioner has not yet approved that recommendation. Cf. Carney v. City of Springfield, 403 Mass. 604, 605 (1988). Under the regulations, 103 C.M.R. 410.14, and in accordance with G.L.c. 127, §§129, the Commissioner is the person authorized to forfeit good time credits. The Superintendent is not so authorized. After the Superintendent reviews the recommendation to forfeit good time credits, he submits the recommendation to the Commissioner. The Commissioner must then decide whether to accept or reject the recommendation or decrease the recommended forfeiture of good credits time. The inmate is entitled to notice of the Commissioner’s decision and must acknowledge receipt of the notice within ten days of the decision. If the Commissioner should reject the recommendation to take away a prisoner’s good time credits, that prisoner may have no reason to seek relief by way of a certiorari action. To calculate the date for filing a certiorari petition from a date earlier than the time the Commissioner has acted on the recommendation to forfeit good time would encourage premature and potentially unnecessary litigation. Accordingly, the statute of limitations began to run on July 24, 1995, the date of the last administrative action by the Commissioner concerning good time forfeiture. LeMay’s action was filed within sixty days of that date, and, therefore, it is timely.
C. Constitutional Violations
G.L.c. 249, §4 provides a means for review of disciplinary proceedings challenged on federal or state constitutional grounds. Review under G.L.c. 249, §4 is limited to “substantial errors of law that affect material rights and are apparent on the record.” Gloucester v. Civil Service Comm'n, 408 Mass. 292, 297 (1990), quoting, Debnam v. Belmont, 388 Mass. 632, 635 (1983). “Since review is confined to the record and is for the purpose of correcting legal error, the inquiry about the presence or absence of genuine issues of material fact, germane to summary judgment procedure, is inappropriate.” Id. The proper inquiry is whether the prison disciplinary board’s decision is “legally tenable” and supported by substantial evidence on the record as a whole. Id., quoting Commissioner of Health & Hospitals of Boston v. Civil Service Comm’n, 23 Mass.App.Ct. 410, 411 (1987). If the Disciplinary Board substantially erred in a way that materially affected LeMay’s rights, judicial correction is required. Id.
LeMay was punished for sending a letter complaining about alleged violations of a court order. In the body of that letter, there is a sentence which states, “Should you decline to act, the safety and well being of correctional officers and inmates at MCI Shirley Medium will be in jeopardy.” The disciplinary report clearly indicates that the reporting staff person deemed those words alone as threatening. The hearing officer found LeMay guilty of the “use of. . . threatening language ... to any inmate [or] staff member ...” based on “the contents of the letter” which she found to be “clearly threatening in nature."
Inmates do not forfeit all constitutional protections simply because they have been convicted and incarcerated. Bell v. Wolfish, 441 U.S. 520, 545 (1979). In particular, prisoners still enjoy freedoms protected by the First and Fourteenth Amendment. Id. “Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.” Turner v. Safley, 482 U.S. 78, 84 (1987). In Massachusetts, the right to speak and to petition is also protected by the Declaration of Rights, Article 9, Langton, 37 Mass.App.Ct. at 19, and by Article 16. In addition, where a state has created a liberty interest in credit for good behavior, that interest is protected by the Due Process Clause. Sandin v. Conner, 115 S.Ct. 2293 (1995). The due process concepts expressed in article 12 of the Massachusetts Declaration of Rights are also applicable to *295 prison disciplinary proceedings. Murphy, 396 Mass. at 833.
1. Freedom of Speech and Right to Petition Government for Redress
The exercise of an inmate’s First Amendment rights may be trumped by legitimate penological concerns. Wolfish, 441 U.S. at 546; Langton, 37 Mass.App.Ct. at 20. “In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.” Pell v. Procunier, 417 U.S. 817, 822 (1974). “Legitimate penological objectives include deterrence of crime, rehabilitation, and preservation of internal security." Bressman v. Farrier, 825 F. Supp. 231, 235 (N.D. Iowa 1993). See also Lovell v. Superintendent North Central Correctional Institution, 26 Mass.App.Ct. 35, 37 (1988).
Unless there is substantial evidence in the record to indicate that prison officials have “exaggerated their response,” deference should be given to the expert judgment of correctional officers relating to matters of prison administration. Pell, 417 U.S. at 827. See also Turner v. Safley, 482 U.S. at 87. “But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.” Procunier v. Martinez, 416 U.S. 396, 405 (1974), rev’d in part, Thornburgh v. Abbott, 490 U.S. 401 (1989).
LeMay does not claim that the prison policy against using threatening language to a staff member or inmate does not serve legitimate penological objectives or that it is facially unconstitutional. Thus, the actions of the prison officials survive First Amendment scrutiny if they were “acting in a good faith and reasonable belief that the restrictions they were imposing were necessary.” Gomes v. Fair, 738 F.2d 517, 525 (1st Cir. 1984) (emphasis in original). This court may not substitute its own judgment for that of the prison officials as long as their view is “honestly held and within rational boundaries.” Id.
The Supreme Court deems written correspondence to be an avenue for providing inmates with an open and substantially unimpeded channel for communicating with persons outside the prison. Pell, 417 U.S. at 824. Outgoing inmate mail cannot be censored merely because it contains “unflattering or unwelcome opinions or factually inaccurate statements." Martinez, 416 U.S. at 413. One purpose of communication explicitly recognized in the First Amendment is communication to a government official seeking redress of grievances. See Cruz v. Beto, 405 U.S. 319, 321 (1972) (“persons in prison, like other individuals, have the right to petition the Government for redress of grievances”); Langton, 37 Mass.App.Ct. at 19-20. ‘The ‘government’ to which the First Amendment guarantees a right of redress of grievances includes the prison authorities, as it includes other administrative arms and units of the government.” Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995). Indeed the significant discretion accorded to prison authorities heightens the importance of allowing prisoners to freely and uninhibitedly seek administrative redress of their grievances against correctional officers. Haymes v. Montanye, 547 F.2d 188, 191 (2d Cir. 1976). As with the exercise of other First Amendment rights, the right to petition may be exercised only to the extent that it is not inconsistent with an inmate’s status as a prisoner or with the legitimate penological objectives of the corrections system.
In Bradley, the prisoner had submitted a grievance concerning a guard with the guard’s superior; it said, “Her [the guard’s] actions shows her misuse of her authority and her psychological disorder needs attention. Then you wonder why things happen like that guard getting beat down? I suggest you talk to this woman and have her act professionally instead of like a child.” 64 F.3d at 1278. The inmate’s choice of words clearly referenced a prior attack on a prison guard. The Bradley court acknowledged the prison’s interest in peaceable operations and the necessity that prisoners treat staff with respect rather than resolving their disputes through violent confrontation. Id. at 1281. However, the court found that punishing Bradley under a rule that prohibited the use of hostile, abusive, or threatening language toward another person when the inmate was petitioning for redress of a grievance violated the prisoner’s First Amendment Rights. Id. at 1281. “A prisoner’s statements in a grievance need not have any more impact on prison security through the maintenance of respect than the prisoner’s unexpressed thoughts." Id.
To punish LeMay for the letter he wrote to Secretary O’Toole would similarly impermissibly chill an inmate’s ability to seek redress for a grievance. While an inmate obviously may be disciplined for making criminal threats, LeMay was requesting the Secretary to intervene in order to prevent what LeMay perceived as a flagrant disregard by the Commissioner of the order in the Sawyer case. The materials accompanying the letter provide a context in which to read and interpret the letter. Those materials, which cannot be ignored, demonstrate a history of court action involving the confiscation of prisoner property in which LeMay was an interested party. LeMay explicitly states that he and fellow inmates do not view the situation as a “prisoner against correctional officer” issue and hope to resolve the dispute through litigation, but he predicted that, if it were not so resolved, physical confrontations were likely to erupt over the controversy. As in Bradley, the link between the prison’s legitimate interest in preventing violent confrontation and the rule against using threatening language is weak.
Notwithstanding the deference that must be afforded to prison officials in the interpretation of an *296 inmate’s use of language, LeMay’s letter, viewed as a whole, cannot rationally be deemed to constitute a threat against a staff member or inmate. A threat to commit a crime involves, among other elements, a communication of an intent to injure. Commonwealth v. De Vincent, 358 Mass. 592, 595 (1971). Such a threat is to be tested objectively; the state of mind of the person threatened is not controlling. Id. See also Robinson v. Bradley, 300 F.Supp. 665, 668 (D.Mass. 1969) (defining threat as “the expression of an intention to inflict evil, injury, or damage on another”). Similarly, in other contexts, the term “threat” has been construed to refer to “the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.” Planned Parenthood League of Massachusetts, Inc., v. Blake, 417 Mass. 467, 474, cert. denied, 115 S.Ct. 118 (1994). Simply making someone fearful by warning of the potential for violence does not, by itself, constitute “threatening language.” See also Young v. Kann, 926 F.2d 1396, 1398, n.5 (3rd Cir. 1991) (inmate’s note to guard concerning his cellmate in which he warned, “(w]ell sir, then you do something about this or I will because by george I’ve reached my limits,” construed to contain no threatening remarks of any kind).
LeMay testified at the Disciplinary Board hearing that he did not intend his letter to Secretary O’Toole as a threat and asked the hearing officer to consider the packet of materials included with the letter. However, in response to the letter, the defendants put LeMay in segregation for seventy-nine days, transferred him to a higher security facility, and took away fifty days of good time credit. Their actions constitute an exaggerated response to the letter. The defendants conducted no investigation beyond reading the letter and ascertaining whether LeMay, in fact, sent it.[13] LeMay’s request, addressed directly and exclusively to Secretary OToole, that she involve herself in how the Department under her command construed court orders and that she defuse an objectively potentially explosive situation cannot reasonably be viewed as a communication which interfered with legitimate penological objectives.
Gomes v. Fair, on which the defendants rely, does not justify treating LeMay’s letter as a threat. In Gomes, a prison inmate gave a young female staff member a folder containing romantic, sexually explicit poems. 738 F.2d at 520. Previously, there had been several encounters between the prisoner and staff member, during one of which he suggested they have a more personal relationship and requested that she meet him after he was released from prison. Id. at 519-20. After reading the poems, and considering her prior interactions with Gomes, the staff member filed a disciplinary report against Gomes. Id. at 520-21. As a result, Gomes was transferred to a higher security prison. Gomes then claimed that he had been transferred for exercising his First Amendment right to write poetry, stating that he had given it to a staff member simply to proofread. Id. at 522. The First Circuit found that the charges made by the staff member, a trained counselor with extensive counseling experience with Gomes himself, were not an overreaction because her previous encounters provided her with “objective indicators to rely upon in filing her disciplinary report.” Id. at 526. She did not “leap to judgment,” and the investigating officials took reasonable steps to investigate the charge. Id. Finally, the reclassification decision in Gomes did not rest solely on a prison official’s interpretation of the poetry, but rather took into account not only Gomes’ relations and attitude toward the female staff member, but also his deteriorating discipline record at the institution, including four prior disciplinary reports. Id. at 527. Because the Court determined that the prison official’s actions were reasonable, whether or not Gomes was guilty of the disciplinary charge itself, a finding of a violation of the First Amendment was unwarranted. Id. at 528. See also Adams v. Gunnell, 729 F.2d 362, 368 (5th Cir. 1984) (where warden’s fears that circulation of petitions among inmates raised the danger that those supporting the petition would coerce other prisoners, subtly or violently, into signing the document, court would not second-guess officials’ decision to punish participants in petition drive).[14]
Unlike the prison officials in Gomes, there is no evidence in this record that the defendants had “objective indicators” about LeMay or his behavior while incarcerated which factored into the finding that LeMay was threatening an inmate or staff member. Further, unlike Gomes, the letter at issue was written to a public official outside the institution, in her capacity as a public official, detailing, with many supporting documents, the nature of a genuine controversy involving an agency over which she has oversight. The sexually explicit poetry in Gomes involved no purported attempt to petition for redress.[15]
After Secretary OToole forwarded the letter to the Commissioner, prison officials unreasonably leapt to judgment. There is insufficient evidence for prison officials to have formed a reasonable belief that LeMay was exercising his right to petition in a way that was inconsistent with legitimate penological concerns, and, therefore, their actions violated LeMay’s First Amendment rights and his concomitant rights under the Declaration of Rights. LeMay’s language, while perhaps not the wisest choice of words, is not equivalent to a threat to foment or engage in violent acts. The letter to Secretary O’Toole is quite unlike the category of outgoing correspondence — escape plans, plans relating to proposed criminal activity, encoded messages — which have been found to be properly subject to prohibition. Martinez, 416 U.S. at 413.
2. Due Process
The federal requirements of due process are satisfied if the findings of the prison disciplinary board depriving an inmate of a state-created liberty interest *297 in credit for good behavior are supported by “some evidence.” Superintendent, M.C.I., Walpole v. Hill, 472 U.S. 445, 455 (1985). The Massachusetts Constitution requires the record to “contain substantial evidence to support the prison disciplinary board’s decisions.” Murphy, 396 Mass. at 833. Where the challenge is to the sufficiency of the evidence justifying a board’s determination in an individual case, the issue is whether that determination is supported by “substantial evidence.” Id. Substantial evidence is “such evidence as ‘a reasonable mind might accept as adequate to support a conclusion.’ ” Cepulonis, 15 Mass.App.Ct. at 296.
The evidence at the disciplinary board hearing in which LeMay was found guilty of using “obscene, abusive or threatening language” to an inmate or staff member does not meet the “substantial” evidence test. At the hearing, LeMay and Blette, were the only people to make statements. LeMay testified that he had a right to speak his mind and that he had sent the letter to “try and warn people that staff and inmates were going to get hurt.” LeMay further testified that the letter was not intended as a threat and that he had previously sent “others the same basic letter without recoil.” Finally, LeMay argued that his letter should be viewed in the context of the whole package of information forwarded to Secretary OToole. Blette testified that he deemed the letter to be threatening. There was no other testimony. In particular, there was no evidence that LeMay had said anything to any inmate or staff member that suggested he might engage in or might encourage others to engage in violent confrontations over the issue of confiscation of inmate property. There is no evidence that the prison had warned LeMay it would be confiscating any of LeMay’s property. The documentary evidence at the hearing consisted simply of the letter sent to Secretary O’Toole by LeMay which was presented by the reporting officer, and a copy of the Sawyer and Drew cases, four affidavits concerning LeMay’s character, and a copy of the decision of the Appeals court in Langton v. Secretary of Public Safety, all of which were submitted by LeMay.
The evidence before the Disciplinary Board is not such that a reasonable mind might accept it as adequate to support the conclusion that LeMay used threatening or abusive language against an inmate or staff member. Because there is not substantial evidence to support the Disciplinary Board’s ruling, LeMay’s due process rights guaranteed by article 12 of the Massachusetts Declaration of Rights were violated. [16]
D. Conclusion
In sum, the defendants violated LeMay’s right to freedom of expression and to petition the government as well as his due process rights. Pursuant to G.L.c. 249, §4, LeMay is entitled to have the guilty finding on Disciplinary Report #95-0886 vacated and to have all sanctions flowing from that report lifted.
III. Massachusetts Civil Rights Act
Under G.L.c. 12, §§11H and I, the Massachusetts Civil Rights Act (“MCRA”), any person whose exercise or enjoyment of rights secured by the United States constitution or the constitution of the Commonwealth has been interfered with or attempted to be interfered with by threats, intimidation, or coercion may institute an action for an equitable relief or compensatory damages. See G.L.c. 12, §§11H and 111.
A. Qualified Immunity
The defendants argue that they are entitled to qualified immunity because their actions were taken in good faith and did not violate any clearly established law. The standard for qualified immunity for public officers performing discretionary functions under the MCRA is the same as the qualified immunity standard under §1983. Duarte v. Healy, 405 Mass. 43, 46 (1989). The defendants are entitled to immunity unless LeMay can demonstrate that they violated clearly established rights of which a reasonable person would have been aware at the time of the incident. Caron v. Silvia, 32 Mass.App.Ct. 271, 273 (1992). See also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To be “clearly established” a court need not previously have considered a situation identical to the one confronting the prison officials; if a court were to be presented with the situation at issue and would find that the plaintiffs rights were violated, the law is clearly established. Caron, 32 Mass.App.Ct. at 273.
LeMay has shown that the constitutional rights which he seeks to vindicate were clearly established at the time of the Disciplinary Board hearing and subsequent imposition of sanctions. The law regarding outgoing prisoner mail was established in 1974 in Procunier v. Martinez, 416 U.S. at 396. Indeed, LeMay himself submitted to the Disciplinary Board a copy of a 1994 Appeals Court decision that also concerned an inmate’s sending a letter to the Secretary of Public Safety. Langton v. Secretary of Public Safety, 37 Mass.App.Ct. at 15. Langton had claimed his federal and state constitutional rights to free expression were violated when he was punished for sending a letter to the Secretary of Public Safety criticizing prison conditions. The Secretary deemed the letter to be “threatening.” Id. at 16-17. In his letter, Langton reported on “some distressing information" he had learned concerning confiscation of video tapes. Id. at 22. He then detailed a litany of ways in which inmates allegedly were being maltreated. The letter concludes with the warning, “If society ever discovers what you have done, what you have created, the tens of thousands injured, it will be the end.” Id. at 23. The Court’s decision contained the following language:
“(P)risoners have a right, subject to reasonable limitations of time and place, to petition prison *298 authorities” for the redress of grievances. Stovall v. Bennett, 471 F. Supp. 1286, 1290 (M.D. Ala. 1979). See Cruz v. Beto, 405 U.S. 319, 321 (1972) (“persons in prison . . . have the right to petition the Government for redress of grievances”). The right emanates from the First and Fourteenth Amendments to the Federal Constitution, art. 9 of the Massachusetts Declaration of Rights, and State law (see, e.g., G.L.c. 30A, §§1-8; G.L.c. 124, §l[i]) . . . Behind prison walls the right to petition is limited because “a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.” Lovell v. Superintendent N. Cent. Correctional Inst., 26 Mass.App.Ct. 35, 37 (1988), quoting from Pell v. Procunier, 417 U.S. 817, 822 (1974). Even a limited right to petition for redress of grievances is elusive, however, if the petitioner must undergo, as a consequence of such an exercise, compulsory psychological examinations, solitary confinement, threatened procedures under G.L.c. 123, or the potential loss of parole.
Id. at 19-20.[17] The fact that prison officials are entitled to significant deference in disciplinary matters does not mean that they are shielded from liability for unreasonable actions they take in violation of a prisoner's constitutional rights.
B. Threats, Intimidation or Coercion
A direct violation of a person’s civil rights does not, by itself, constitute threats, intimidation, or coercion. Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989). Direct, preemptive acts that do not seek to coerce a person to do or not to do something do not constitute threats, intimidation or coercion within the meaning of the MCRA. Pheasant Ridge Associates Limited Partnership v. Burlington, 399 Mass. 771, 781 (1987).[18]
As the plaintiff acknowledges, a prison environment is, by its nature, confining and coercive, and not every use of force by prison officials to compel a prisoner to act is a violation of the MCRA. Longval, 404 Mass. at 333. In Langton v. Secretary of Public Safety, 37 Mass.App.Ct. at 15, the Court analyzed the issue of “threats, intimidation, or coercion” in the context of a letter sent by an inmate to the Secretary of Public Safety. Because the letter was viewed as threatening, the prisoner was forced to submit to a psychological examination under threat of lock-up and the loss of an opportunity for parole. In conflicting affidavits, the prisoner alleged that the action was to retaliate against him for sending the letter, while the Secretary claimed that the prison’s action was not retaliatory, but for the purpose of evaluating the prisoner’s mental health. Id. at 18. Given the questions of fact raised by the opposing affidavits, the Court overturned the dismissal of the MCRA claim. Id. at 21-22. The Court concluded that if the plaintiff were to prove at trial that prison officials retaliated against him with threats of retribution in order to compel his silence, that conduct would satisfy the coercive conduct element of a MCRA claim. Id. at 20.
In the instant case, LeMay was actually punished, not just threatened with punishment. The actions taken against him, however, are not sufficient to demonstrate indisputably, within the prison context, that the defendants violated LeMay’s rights by way of threats, intimidation, and coercion. In Longval, faced with a claim by a prisoner that his rights had been violated when he was transferred to another prison, the Court, recognizing the uniqueness of a prison environment, found “no coercion, within the meaning of the State Civil Rights Act, simply from the use of force by prison officials, authorized to use force, in order to compel a prisoner to do something that he would not willingly do, even if it turns out that the official had no lawful right to compel the prisoner to take that action.” 404 Mass. at 333. However, the Court noted that “[i]f the officials had some further purpose in treating [the prisoner) as they did, threats, intimidation, or coercion might be involved.” Id.
LeMay claims that the defendants acted for the purpose of dissuading him from communicating with Secretary OToole concerning issues at the prison. The record would, indeed, support an inference that the disciplinary proceedings were used to chill LeMay’s constitutional rights in order to insure that LeMay did not complain again.[19] The record, however, would also support an inference that the defendants, while acting unreasonably, actually did believe that LeMay had violated a disciplinary rule and imposed sanctions upon him solely because they believed he had violated that rule and to deter further violations of that rule, without any nefarious purpose in mind. Where, as here, the evidence would support conflicting inferences, neither the plaintiff nor the defendants are entitled to summary judgment on the MCRA claim.[20] Langton, 37 Mass.App.Ct. at 18.
Because the actions of the defendants have been determined to have violated LeMay’s constitutional rights, the only MCRA issue that remains is whether LeMay’s constitutional rights were interfered with by threats, intimidation, or coercion within the meaning of the MCRA.[21]
ORDER
For the foregoing reasons, it is hereby ORDERED that the cross-motions for summary judgment be ALLOWED in part and DENIED in part as follows:
A. summary judgment in favor of the defendants is ALLOWED as to plaintiffs §1983 claim, and that claim is ordered DISMISSED without prejudice;
B. summary judgment in favor of the plaintiff is ALLOWED as to plaintiffs claim for relief under G.L.c. 249, §4, and it is further ORDERED that Disciplinary Report 95-0886 be vacated, that the fifty days of statutory good conduct credits forfeited *299 as a result of Disciplinary Report 95-0886 be restored, and that the defendants be enjoined from keeping LeMay from his classification to MCI Shirley for any reason relating to Disciplinary Report 95-0886 and from keeping any record in any file of said disciplinary report or any other related information; and
C. summary judgment with respect to the claim under the Massachusetts Civil Rights Act is DENIED as to both the plaintiff and the defendants.

The plaintiff also brings a claim under the Religious Freedom Restoration Act, 42 U.S.C. §§2000bb et seq. That claim is not the subject of the cross-motions for summary judgment.

The Grandfather Clause provided as follows: “Inmates presently within the Department will retain their present property inventory as they proceed through the system to lower security institutions. If an inmate is returned to a higher security level institution, the inmate will be considered as a return to the Department and will be required to comply with the requirements of the new 103 CMR 403.”

The full text of the letter is as follows:
Re: Confiscation of Prisoner’s Property in violation of a Court Order
Dear Secretary O’Toole:
Enclosed please find a brief presentation of the controversy between prisoners at MCI Shirley medium and the Commissioner of Correction Larry E. Dubois and Superintendent William Coalter.
If you would intervene and instruct the Commissioner and Superintendent to abide by the lawful orders of the Court and halt their unlawful act, this entire matter would be defused.
Should you decline to act, the safety and well being of correctional officers and inmates at MCI Shirley medium will be in jeopardy.
I sincerely hope you will not allow this matter to go unattended to by your office.
Sincerely, Kevin Grayhawk LeMay

The other charges included: Offense #1 — disobeying an order of, lying to, or insolence toward a staff member; Offense #2 — violating any departmental rule or regulation, or any other rule, regulation, or condition of an institution or community based program; Offense #8 — conduct which disrupts or interferes with the security or orderly running of the institution; Offense # 14 — participating or encouraging a work stoppage, hostage taking, or unauthorized job demonstration; Offense #33 — attempting to commit any of the listed offenses or helping another to commit any of the listed offenses in the Code of Offenses.

LeMay remained in segregation from April 27, 1995, the day he was interviewed, through the time he was transferred out of MCI Shirley on July 14, 1995, a total of seventy-nine days.

Counts I through IV claim that the defendants’ disciplinary actions and punishment, including placing the plaintiff in segregation, reclassifying him, and forfeiting fifty days of good time credits, violated the First and Fourteenth Amendments to the United States Constitution, Articles 1,2, 10, 11, 12, and 16 of the Massachusetts Declaration of Rights, 42 U.S.C. §1983, and G.L.c. 12, §§11H and 111.

Plaintiff s contention that requiring a prisoner to seek the invalidation of a prison disciplinary hearing through certiorari would impermissibly shorten the statute of limitation for §1983 actions ignores the holding in Heck that, while state challenges are being pursued, the §1983 claim has not yet arisen. “[A] §1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated.” Heck, 512 U.S. at 489-90.

Should LeMay choose to refile a §1983 damages claim now that the Disciplinary Board ruling has been invalidated in the context of this action, such a claim should not name as defendants state officials acting in their official capacity because a suit against state officers in their official capacities is essentially a suit against the state, and, as such, may not be brought under §1983. See Will v. Michigan Dep’t of State Police, 491 U.S. 58, 71 (1989); Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1991).

In Edwards, the plaintiff alleged that prison officials routinely failed to date-stamp witness statements in order to weaken due process challenges for failure to call witnesses; he sought an injunction requiring prison officials, in the future, to date-stamp witness statements as they are received. The Court noted that ordinarily such a prayer for prospective relief will not necessarily imply the invalidity of a previous loss of good time credits and may, therefore, properly be brought under §1983. 117 S.Ct. at 1589.

The statement in McLellan, 29 Mass.App.Ct. at 934-35, that, “(e]ven if the sixty-day period did not start running until the plaintiff had notice that his administrative appeals had been decided," does not constitute a holding that the sixty days necessarily begins to run when such notice has been received. The plaintiff in McLellan, following a disciplinary hearing on two reports, was sanctioned with ten days isolation and required to pay a cleaning bill. He was notified that his appeal with respect to one report was denied in February of 1988, and, by March of 1988, when he began to serve his isolation, he was told it was too late to appeal the second report. The inmate’s complaint was not filed until February 13, 1989, almost a year later. There is nothing in the decision which suggests that the Commissioner was required to take any administrative action before the sanction in that case could take effect.

In connection with their motion for summary judgment, the defendants referred to LeMay’s record of criminal convictions; however, the only relevant evidence is that considered at LeMay’s disciplinary hearing. There is no evidence that the hearing officer (or any other defendant) took the nature of LeMay’s criminal history into account.

In Adams, the Court noted that the inmates-plaintiffs had not been disciplined for individual correspondence or communication with persons outside the prison and that they had not been punished for expressing individual grievances to the prison administration. In contrast to LeMay, “(tjheir freedoms of individual expression and petition are, therefore, touched, but not seriously infringed.” Adams, 929 F.2d at 367.

Defendants’ reliance on Battista v. DiPaolo, No. 95-5041-E (Suffolk Superior Ct. Jan. 27, 1998) (Cratsley, J.), is misplaced. In Battista, the court recognized that a prisoner’s outgoing mail is broadly protected by the First Amendment, but found that the prison had acted reasonably in investigating allegations that Battista had sent a threatening letter to a psychiatrist; the court pointed out that there was no evidence that the prison had exaggerated its response to the *300 situation. Additionally, the inmate in Battista, unlike LeMay, was not disciplined in any fashion upon the completion of the prison’s investigation. LeMay does not claim that the defendants violated his constitutional rights simply by investigating his transmittal of a letter to Secretary O’Toole.

It is unnecessary to decide whether the Disciplinary Board’s ruling satisfies the alternative federal standard of “some” evidence. Hill, 472 U.S. at 455.

In Langton, the Court did not reach whether, as a matter of law, the plaintiffs First Amendment rights had been interfered with. Langton, 37 Mass.App.Ct. at 18.

A “threat” under the MCRA means the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474, cert. denied, 115 S. Ct. 118 (1994). Intimidation means putting someone in fear in order to compel or deter conduct. Id. “Coercion" is the use of physical or moral force to compel another person to act or assent to action. Swanset Development Corp. v. Taunton, 423 Mass. 390, 396 (1996).

The hearing officer stated in her report that the purpose of punishing LeMay was to “deter him from sending any more letters similar in nature.”

The MCRA count appears to seek injunctive relief as well as damages. To the extent that it seeks damages against the defendants in their official capacities, the plaintiff is not entitled to such damages as the state did not waive sovereign immunity by enacting the MCRA. Commonwealth v. ELM Medical Laboratories, Inc., 33 Mass.App.Ct. 71, 80 (1992).

To the extent that the complaint purports to state a cause of action for damages directly under the Massachusetts constitution, this count need not reach whether such relief may be obtained since the MCRA claims survive summary judgment. If a violation of a constitutional right can be redressed within the ambit of the MCRA the MCRA provides a well-worn procedural path to relief for such a violation. Layne v. Superintendent, MCI, Cedar Junction, 406 Mass. 156, 159 (1989).